**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ellis Wayne YORK, Defendant–Appellant.**

**No. 89–2107.**

United States Court of Appeals, Fifth Circuit.

Feb. 21, 1990.

Rehearing and Rehearing En Banc Denied Feb. 21, 1990.

---

Alexander Bunin, Edward A. Mallett, Houston, Tex., for defendant-appellant.

James L. Turner, Paula Offenhauser, Frances H. Stacy, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, POLITZ and WILLIAMS, Circuit Judges.

CLARK, Chief Judge:

## I.

Ellis Wayne York appeals his conviction on one count of receipt of a firearm by a convicted felon and one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(h)(1) and 924(a). York contends that the district court erred in refusing to suppress evidence gained on the authority of a search warrant issued on the basis of information gathered by police in violation of the fourth amendment. We affirm.

## II.

On April 11, 1986, a deputy of the Harris County, Texas, Sheriff's Office responded to a disturbance call in Crosby, Texas. When the deputy reached the reported location, he found a man named Bill and his two minor sons waiting on the street. (Bill was never further identified. He did not participate in York's trial.) Upon their arrival, Bill told the officers that he and his family had been living as guests in York's home, located nearby. Bill complained that York had come home drunk that evening and had threatened Bill and his children. Bill had then departed with his two sons, leaving behind his daughter who was taking a bath at the time. Bill asked the deputy to accompany him to York's house so that he and his family could peacefully remove their belongings and leave permanently.

The responding deputy and two other deputies then took Bill and his sons to

York's home two blocks away. The deputies radioed their dispatcher to telephone the daughter inside the home and ask her to step outside so that they could assess the situation. When this was done, the daughter came outside and met the deputies. She told them that she believed York was in his bedroom asleep. Bill and his family then led the deputies into the house, and the family began loading their belongings into Bill's truck and the daughter's car. The officers entered and stood inside the entrance foyer which opened into the living room of the house. From that point, they could see a glass-fronted gun cabinet located in the living room. Several guns inside the cabinet were visible. One appeared to be an Uzi machine gun and another a Thompson sub-machine gun. The deputies did not touch the gun cabinet or the guns.

While Bill and his family were removing their belongings, York came from the back of the house and ordered the officers to leave. He was belligerent and appeared intoxicated. After arguing with the deputies, York stated that he wanted to call his attorney, and he walked toward the back of the house. One of the deputies followed York into a bedroom where he observed York try in vain to contact his attorney by telephone. From his position in the bedroom, the deputy observed a pistol lying on York's nightstand and a sawed-off shotgun propped against the wall near the bed. As soon as Bill and his family finished loading their goods, the deputies escorted them to another residence.

Believing that it was illegal for a civilian to own some of the weapons he had observed in York's living-room gun case, one of the deputies later contacted the Federal Bureau of Alcohol, Tobacco and Firearms ("ATF") and reported seeing the guns. Upon investigation, ATF agents determined that York had been convicted of burglary in Arkansas in 1962 and 1963. The agents obtained a search warrant for York's home based on the deputy's report and seized the guns. York was later convicted of illegally receiving and possessing firearms. He was fined $15,000 and was sentenced to five years supervised probation for each count.

### III.

On appeal York argues that the district court erred in refusing to suppress the evidence gained through the ATF search warrant. He contends that the deputies' warrantless entry into his home violated his rights under the fourth amendment to the Constitution and that the search warrant was therefore issued on the basis of information gained improperly.

 The definition of "search" as that term is used in the fourth amendment is discussed in *National Treasury Employees Union v. Von Raab*, 816 F.2d 170 (5th Cir.1987), *aff'd in part, vacated in part and remanded*, —— U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). We stated:

> A search occurs when the government infringes "an expectation of privacy that society is prepared to consider reasonable" ... Not all invasions of privacy or interferences with liberty or property, then, are searches or seizures. Before the infringement can be labeled either "search" or "seizure," in the sense in which those words are used in the fourth amendment, the government action *must be unreasonable or constitute a meaningful interference*. These criteria are implied from the very use of the terms, "search" and "seizure." In addition, by its express text, the amendment prohibits only those searches and seizures that are unreasonable in the particular circumstances in which they are performed.

816 F.2d at 175 (*quoting United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)) (emphasis in original). Thus, we established a two-step analysis for determining whether a governmental activity activates the fourth amendment. This court first considers whether the activity intrudes upon a reasonable expectation of privacy in such a significant way to make the activity a "search." Then, if we find a "search" has occurred, we determine whether the governmental intrusion was unreasonable given the particular facts of the case. *Id.*; *see also*

*United States v. Johnson*, 431 F.2d 441 (5th Cir.1970) (en banc).

## IV.

■ The Supreme Court has often recognized that "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). *See, e.g., Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Indeed, the right to be free from unreasonable government intrusion into one's own home is a cornerstone of the liberties protected by the fourth amendment. *Payton*, 445 U.S. at 583–589, 100 S.Ct. at 1378–1382. Yet, although the right to privacy in the home is certainly a reasonable expectation, it has also been noted that this expectation can be reduced as a result of the activities of the home's occupants. *See United States v. Taborda*, 635 F.2d 131, 138–39 (2d Cir.1980). For instance, occupants who leave window curtains or blinds open expose themselves to the public's scrutiny of activities within that part of the house that can be seen from outside the premises. The police may look into that opening from any point in a public thoroughfare or sidewalk without engaging in a fourth amendment search, *Taborda*, 635 F.2d at 138–39; *Cf. United States v. Burns*, 624 F.2d 95 (10th Cir.1980), *cert. denied*, 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980) (Overhearing a loud conversation in a hotel was not a search.); *United States v. Orozco*, 590 F.2d 789 (9th Cir.), *cert. denied*, 442 U.S. 920, 99 S.Ct. 2845, 61 L.Ed.2d 288 (1979) (Looking through a car window was not a search.), even though a "search" would have occurred if the same view had been obtained at a time when the curtains were closed. *See Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.")

Similarly, activities or circumstances within a dwelling may lessen the owner's reasonable expectation of privacy by creating a risk of intrusion which is "reasonably foreseeable." *See United States v. Bomengo*, 580 F.2d 173 (5th Cir.1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). In Bomengo, the maintenance engineer of an apartment complex noticed water leaking from Bomengo's apartment. After trying unsuccessfully to locate Bomengo, the engineer entered the apartment to see if its occupants were sick or disabled and to inspect the severity of the water leak. While in the apartment, the engineer saw in plain view, through an open closet door, two pistols with attached silencers. The engineer notified the apartment complex security guard, who contacted the police. A police detective then entered the apartment with the engineer and viewed the guns. The detective then obtained a search warrant which led to Bomengo's arrest and conviction. We held that the warrantless entry of the detective into Bomengo's home was not a search for fourth amendment purposes because the detective had proceeded no farther in his investigation of the premises than the private citizens had already gone and because "the efforts of the apartment employees to deal with the leaking water were not illegal and were a *reasonably foreseeable intrusion of privacy.*" 580 F.2d at 176 (emphasis supplied).

In the present case the actions of the Harris County deputies were made reasonably foreseeable when York became intoxicated and belligerent and threatened Bill and his children, whom he had allowed to occupy his home. Had Bill lacked this permitted nexus with the interior of York's home, Bill's reaction to York's abusive treatment probably would not have authorized the deputies to step inside York's home. But because Bill and his children were guests, invited to live for a time in York's home, the threatening actions of York combined with this permitted occupancy to make it reasonable for Bill to enlist the aid of the police in removing from York's premises possessions that were incidents of his family's daily life.

York's threats of violence to Bill and his children made it foreseeable that Bill would seek help in removing his possessions. The actions of the deputies, "for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973) (Many police activities involving the custody of motor vehicles are within the caretaking function of the police, and this may work to make a vehicle inspection or search reasonable.); *see also United States v. Coleman*, 628 F.2d 961, 965 (6th Cir.1980).

When York invited Bill and his family to share his residence, he necessarily invited the normal incidents of joint occupancy, including the introduction of property belonging to Bill which Bill retained the right to remove when his invitee status ended. Likewise, when York became intoxicated and belligerent, it was reasonable to expect that Bill might ask police officers to make a limited entry into the house to keep the peace while he removed his family and personal possessions. We need not decide whether Bill also had the authority to give valid consent for a search of the premises. The police initially entered only the first room of the dwelling. From that point, where they had a right to be as peacekeepers, they had a plain view of the guns which prompted the call to the ATF. This reasonable police action did not violate any privacy interest York had in his home in view of his invitation to Bill's family to occupy the house and York's actions earlier in the evening. No fourth amendment "search" took place.

### V.

The judgment of the district court is AFFIRMED.