COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

                                        NO.
2-05-338-CV

 

PHILLIP K. POTEET, INDIVIDUALLY                                         APPELLANT

AND
AS NEXT FRIEND FOR

JEFFREY
POTEET, A MINOR

                                                   V.

 

COLIN J. SULLIVAN, HENRY                                                  APPELLEES

LUCIO,
BYRON LAKE AND TOWN 

OF
FLOWER MOUND, TEXAS

 

                                              ------------

 

            FROM
THE 367TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                OPINION
ON REHEARING

 

                                              ------------

After considering our prior
opinion on appellant=s and
appellees Colin J. Sullivan and Henry Lucio=s motions for rehearing, we deny the motions, but withdraw our opinion
and judgment dated November 30, 2006, and substitute the following.

 

 








I. Introduction

Appellant Phillip K. Poteet
appeals the trial court=s grant of
summary judgment in favor of the Town of Flower Mound and Flower Mound police
officers Colin J. Sullivan, Henry Lucio, and Byron Lake.  Because we hold that Poteet produced
sufficient evidence raising a genuine question of material fact regarding
whether Officers Sullivan and Lucio were entitled to the defense of qualified
immunity, we reverse the trial court=s grant of summary judgment to Sullivan and Lucio.  In all other respects, we affirm.

II.
Background

This is the case of the bad
breakup.  Around January 2001, Poteet and
his fiancee, Tanya Chin, moved from Oklahoma to Flower Mound, Texas, into a
home that Poteet purchased.  A year and a
half later, on June 6, 2002, Poteet told Chin that he had accepted a job in
Atlanta, Georgia, and that he wanted to break off their engagement.  The events surrounding their division of
property after their breakup form the basis of Poteet=s lawsuit and appeal.

A.     Initial Calls to Police

The morning after the
breakup, Chin called police to complain about a verbal argument between the two
over property issues.  According to the
police report, Chin and Poteet eventually agreed to return each other=s belongings, and Chin stated that she intended to pack up her
personal items and move out.  The report
also observed that the officers saw no signs of physical violence.








Two days later, on Sunday,
June 9, 2002, Chin=s parents
and brother-in-law came to Flower Mound to help her move.  They loaded most of Chin=s personal items into their vehicles, but Chin also attempted to take
property belonging to Poteet as well. 
This time, Poteet called police. 
The police arrived and requested Chin and her family to leave; they did
so, taking Chin=s personal
property with them.  Later that
afternoon, Poteet found some additional items belonging to Chin that she had
left behind.  Chin=s aunt came to his home and collected the items.  Poteet then changed the locks on the doors to
his home and the security code to the home=s alarm system.

The next morning, Chin
returned to Poteet=s home with
her parents, her brother-in-law and his wife, her aunt, and a locksmith.  As the locksmith began to pick the lock on
the front door, Poteet called police to report that the group was attempting to
break into his home.  Officers arrived
and requested the group to leave, and they complied.  Later that day, Poteet again found items that
Chin had left behind; he called Chin=s aunt, who returned to the home and picked up the items.  The next day, Poteet posted a Ano trespassing@ sign on his
front door expressly stating that Chin did not live in the home and that he did
not give her permission to enter the home.








Then on Wednesday, June 12,
2002, Poteet called police to file a report about Chin=s behavior.  The responding
officer told Poteet that Chin could come on the premises and into the house
because she had established residency there. 
According to the police report, the officer told Poteet that Athis was all a civil matter.@  Poteet disagreed and Asaid if someone came back and tried to get into the house, he had a
right to protect it and something big would happen.@

Later that day, Poteet
received a message on his home answering machine from Eric Hill, an attorney
calling on Chin=s
behalf.  Poteet returned the call the
next day.  Hill told Poteet that Chin
wanted some items from the home, but Poteet claimed that those items belonged
to him.  Poteet told Hill that he would
be willing to give Chin some of these items in exchange for Chin=s engagement ring.  Hill faxed
Poteet a list of items that Chin wanted; Poteet faxed it back with notations
showing items that he agreed to give Chin as well as items that he had already
returned to Chin via her aunt.  Poteet
also informed Hill that he had allowed Chin to remove her personal property on
June 9 and that none of Chin=s property remained in the home; but if Poteet found any more property
belonging to Chin, he would Aexercise reasonable care in ensuring that the items are returned to
her.@ 

B.     The Civil Standby








On Wednesday, the same day
that Poteet called police to file a report, Chin also contacted police to
request a Acivil
standby@ so that she could remove her property from Poteet=s home.  She told Flower Mound
Police Captain Byron Lake that Poteet had engaged in physical contact and
abusive behavior towards her while they had dated, that Poteet had grabbed her
several times as she was packing her belongings, and that she was afraid that
Poteet would be violent towards her if she came back to his home to get her
personal property.  Captain Lake told
Chin that police would conduct a thirty-minute civil standby and subsequently
requested Officer Colin J. Sullivan to perform it.  Officer Sullivan then contacted Chin, and
they scheduled the standby to take place the next afternoon.  Officer Sullivan arranged for Officer Henry
Lucio to assist him with the civil standby.

The next day, Thursday, June
13, 2002, Officer Sullivan and Chin had several telephone conversations
discussing the coordination of a locksmith, the people whom Chin needed to help
her move her belongings, and whether Poteet would be present during the civil
standby.  At about 3:30 p.m., Officers
Sullivan and Lucio arrived at Poteet=s home to execute the civil standby; meeting them in the front yard
were Chin and her parents, brother, and uncle, three of Poteet=s neighbors, a locksmith, and other people whom Poteet did not
recognize.  Chin also had brought a
U-Haul moving van, which was parked in the driveway.  Poteet was inside his home along with his
six-year-old son, nineteen-year-old daughter, and her two friends.








When the locksmith began to
pick the lock on the front door, Poteet opened the door and saw Officers
Sullivan and Lucio.  According to Poteet,
the officers ordered him to keep the door open and pushed him away from the
doorway.  Poteet claimed that the
officers told him they were there to keep the peace and Ato assist Tanya in getting her things,@ and that if he touched Chin or anyone in her group, they would arrest
him and take him to jail.  Poteet had
packed up many of his personal belongings in preparation for his move to
Atlanta, and these boxes were sitting in the front entryway.  Chin and her companions loaded up all these
boxes into the moving van and then scattered throughout the rest of the house,
gathering up his unboxed property and carrying it off.

Poteet claimed that, while
Chin and her group were moving throughout his house and taking his personal
property from the home, the police officers confined him to a corner of the
home=s entryway and physically restrained him by holding his shoulders,
arms, and wrists.  Poteet repeatedly
tried to move out of the corner to stop Chin and her companions from carrying
off his property, but each time he tried to move, the officers would shove him
back into the corner.  According to
Poteet, when he tried to push back or resist the confinement, an officer put
his finger in Poteet=s face and
said, AYou move one more time, you touch me again, you=re going straight to jail.@  Both officers, however, deny
ever making any effort to stop Poteet or his family from moving about the
house.








As the situation progressed,
shouting and arguing ensued between Poteet and his family and Chin and her
group, creating a situation that both Poteet and Officer Lucio described as Achaotic.@  Several struggles over property also broke
out between the two sides.  Poteet=s daughter and Chin fought over a picture; when Poteet tried to go to
his daughter, the officers continued blocking him in a corner of the entryway
and would not let him out.  Poteet
claimed that he finally slipped around the officers when he saw Chin=s brother and father carrying out file boxes containing Poteet=s tax documents, receipts, and other personal papers.  Poteet grabbed the boxes and struggled with
the men, hurting his back in the process. 
Meanwhile, the persons whom Poteet did not recognize, along with Chin=s father and uncle, began to move Poteet=s refrigerator out the front door. 
Poteet and his daughter pushed on the opposite side of the refrigerator,
resisting their efforts to remove the refrigerator from his home.  In addition, Poteet and Chin=s father fought over a picture and broke the glass, which sprayed into
the foyer of Poteet=s home.

Finally, Officer Sullivan
told Chin and her companions that they were out of time and needed to leave the
house.  According to Poteet, after Chin
left, Officer Lucio searched through his house by Aperform[ing] a sweep of the premises@; Officer Lucio denies this. 
Poteet claims that Chin took most of his property that had been in the
house, including items such as his kitchen and dining room tables and chairs,
the comforter and pillows from his daughter=s bedroom, and his son=s board games and Nintendo 64 video game system.

 








C.     Procedural History

Poteet, on behalf of himself
and his son, Jeffrey, sued Chin, Chin=s friends and relatives who participated in the removal of items from
his home, Officers Sullivan and Lucio, Captain Lake, and the Town of Flower
Mound for damages stemming from the incident. 
In this lawsuit, Poteet asserted a '  1983 claim against appellees,
arguing that they were liable to him because they deprived him of his Fourth
and Fifth Amendment rights to be free from unreasonable searches and seizures
and from being deprived of his property without due process of law.  U.S.
Const. amend. IV, V; 42 U.S.C.A. ' 1983 (West 2003).[1]  Officers Sullivan and Lucio, Captain Lake,
and the Town of Flower Mound all filed motions for summary judgment, which the
trial court granted.[2]  Poteet now appeals.

 

 








III. Officers Sullivan and Lucio

Officers Sullivan and Lucio
moved for summary judgment on the grounds of qualified immunity, and the trial
court granted their motions.  In his
first three issues, Poteet argues that the trial court erred in granting
summary judgment, contending that the officers are not entitled to qualified
immunity because they violated his constitutional rights by entering his house
without a warrant and confining him to a portion of his home while allowing
Chin and her entourage to take his personal property from the home. 

A.     Standard of Review

In a summary judgment case, the
issue on appeal is whether the movant met the summary judgment burden by
establishing that no genuine issue of material fact exists and that the movant
is entitled to judgment as a matter of law. 
Tex. R. Civ. P. 166a(c); Sw.
Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002); City of
Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).  When reviewing a summary judgment, we take as
true all evidence favorable to the nonmovant, and we indulge every reasonable
inference and resolve any doubts in the nonmovant=s favor.  Valence Operating
Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  Evidence that favors the movant=s position will not be considered unless it is uncontroverted.  Great Am. Reserve Ins. Co. v. San Antonio
Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex. 1965).








Generally, a defendant is
entitled to summary judgment on an affirmative defense if the defendant
presents evidence that establishes each element of the affirmative defense as a
matter of law.  Ryland Group, Inc. v.
Hood, 924 S.W.2d 120, 121 (Tex. 1996). 
For the defense of qualified immunity under federal law and section 1983
claims, however, such is not the case: A[A] defendant asserting immunity is not required to establish the
defense beyond peradventure, as he would have to do for other affirmative
defenses.@  Cousin v. Small, 325 F.3d 627, 632
(5th Cir.), cert. denied, 540 U.S. 826 (2003).  The moving party is not required to put forth
evidence to meet its summary judgment burden for a claim of qualified immunity;
rather, it is sufficient that the movant in good faith pleads that it is
entitled to immunity.  Id.  Once the movant asserts this affirmative
defense, the burden shifts to the plaintiff to rebut it.  Id.  Accordingly, to survive summary judgment,
Poteet was required to come forward with competent controverting evidence
raising a genuine issue of material fact with regard to the issue of whether
the officers were entitled to qualified immunity.  See Centeq Realty, Inc. v. Siegler,
899 S.W.2d 195, 197 (Tex. 1995).

B.     Qualified Immunity








Government officials
performing discretionary functions are protected from civil liability under the
doctrine of qualified immunity if their conduct violates no clearly established
statutory or constitutional rights of which a reasonable person would have
known.  Harlow v. Fitzgerald, 457
U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). 
To review claims of qualified immunity, a court first asks whether,
taken in the light most favorable to the party asserting the injury, the facts
alleged show that the officers= conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201,
121 S. Ct. 2151, 2156 (2001).  If so, the
court must then consider whether the right was clearly established, that is,
whether it would be clear to a reasonable officer that his conduct was unlawful
in the situation he confronted.  Id.
at 202, 121 S. Ct. at 2156. 

1.     Did Officers Sullivan and Lucio violate
Poteet=s
constitutional rights?

 

In his first issue, Poteet
argues that all appellees were not entitled to judgment as a matter of law that
they had not violated his civil rights because the evidence showed that
appellees violated the Fourth and Fourteenth Amendments when Officers Sullivan
and Lucio accompanied Chin into his home, obstructed him from preventing the
seizure of most of his possessions, and supervised and assisted with this
intrusion and seizure.  See U.S. Const. amend. IV, XIV.[3]  








a.      The officers=
entry constituted a Asearch@
under the Fourth Amendment

 








Appellees argue that no
Fourth Amendment violation occurred because the officers entered Poteet=s home just to keep the peace while Chin removed her property, not to
search through it for the purpose of finding something.  However, A[a] search occurs when an expectation of privacy that society is
prepared to consider reasonable is infringed.@  United States v. Jacobson,
466 U.S. 109, 113, 104 S. Ct. 1652, 1656 (1984).  Therefore, A>the issue is not= the law
enforcement officer=s >state of mind=Cwhether he was intentionally rummaging about for contraband or wished
to find something in particularC>but the objective effect of his actions=Cwhether a reasonable expectation of privacy was infringed.@  United States v. Maple,
348 F.3d 260, 263 (D.C. Cir. 2003) (op. on reh=g) (quoting Bond v. United States, 529 U.S. 334, 338 n.2, 120
S. Ct. 1462, 1465 n.2 (2000)). 
Accordingly, we do not agree with appellees that a person=s right to be secure in his home would not be infringed when police
enter the home and block the homeowner in a corner while allowing other people
to carry away the homeowner=s property merely because the police did not enter for the purpose of
looking through the home for some item. 
Rather, viewing the record in the light most favorable to Poteet, we
conclude that the officers= actions did violate Poteet=s reasonable expectation of privacy and, thus, constituted a Asearch@ for
purposes of the Fourth Amendment.  

b.     The officers=
entry may have constituted a Aseizure@
under the Fourth Amendment

 

Appellees also argue that
Poteet did not come forward with any evidence that Officer Sullivan or Lucio
seized and removed his property or that they supervised and assisted with the
seizure of his property.  A Aseizure@  of property occurs when there is some
meaningful interference with an individual=s possessory interests in that property.  Jacobson, 466 U.S. at 133, 104 S. Ct.
at 1656.  The question here, then, is
whether the assistance provided by Officers Sullivan and Lucio to Chin and her
group during the civil standby rose to the level of constituting an interference
with Poteet=s possessory
interests in the property that Chin removed from his home.








It is well settled that
police officers who perform civil standbys to keep the peace during a private
party=s repossession of property when right to possession of that property
is disputed are not state actors if they act only to keep the peace, Abut they cross the line if they affirmatively intervene to aid the
repossessor.@  Marcus v. McCollum, 394 F.3d 813, 818
(10th Cir. 2004) (citing Barrett v. Harwood, 189 F.3d 297, 302 (2d Cir.
1999), cert. denied, 530 U.S. 1262 (2000)); Abbott v. Latshaw,
164 F.3d 141, 149 (3d Cir. 1998), cert. denied, 527 U.S. 1035 (1999); Cofield
v. Randolph County Comm=n, 90 F.3d 468, 471 (11th Cir. 1996); Jones
v. Gutschenritter, 909 F.2d 1208, 1211-12 (8th Cir. 1990); Greco v. Guss,
775 F.2d 161, 168 (7th Cir. 1985); Harris v. City of Roseburg, 664 F.2d
1121, 1127 (9th Cir. 1981); United States v. Coleman, 628 F.2d 961, 964
& n.1 (6th Cir. 1980); Menchaca v. Chrysler Credit Corp., 613 F.2d
507, 513 (5th Cir.), cert. denied, 449 U.S. 953 (1980).  A[T]he overarching lesson of the case law is that officers may act to
diffuse a volatile situation, but may not aid the repossessor in such a way
that the repossession would not have occurred but for their assistance.@  Marcus, 394 F.3d at
819.  In other words, although mere
acquiescence by the police to Astand by in case of trouble@ is insufficient to constitute state action, police intervention and
aid will constitute state action.  Harris,
664 F.2d at 1127.








Our analysis is not affected
by the fact that the foregoing cases do not specifically deal with the domestic
violence context because the role of police in all civil standbysCwhether in the domestic violence or any other contextCis to prevent violence from occurring. 
See Tex. Code Crim. Proc.
Ann. art. 5.045 (Vernon 2005) (providing that a peace officer Amay stay with a victim of family violence to protect the victim and
allow the victim to take the personal property of the victim or of a child in
the care of the victim to a place of safety in an orderly manner@); Marcus, 394 F.3d at 818.  
Like a repossessor, Chin went onto property owned by another to retrieve
items, and the ownership of those items was disputed.  Nothing in the law gives police a greater
right to provide affirmative aid to a domestic violence victim who goes onto
another=s property and removes items to which ownership is disputed merely
because the dispute occurs during a domestic violence standby, as opposed to
any other type of standby.  The
peacekeeping role of the police is the same no matter the subject matter of the
standby.








Viewing the evidence in the
light most favorable to Poteet, we conclude that the evidence raises a fact
issue as to whether the actions of Officers Sullivan and Lucio went beyond
keeping the peace into providing affirmative aid to the seizure of most of the
contents of Poteet=s home.  Without the officers= assistance, Chin may not have been able to gain entrance into Poteet=s home; Poteet had made clear that Chin was not allowed on his
property, but the officers ordered him to keep the door open to Chin and her
group and pushed him away from the door so that they could enter.  Furthermore, Poteet claimed that, at least
for the first part of the standby, the officers= physical restraint and threats of jail precluded him from even
attempting to stop Chin and her companions from carrying off his property
because they confined him to a corner of his home and held his shoulders, arms,
and wrists while Chin and her companions took property from the home.  When Poteet attempted to get away from the
officers and stop Chin from taking items that did not belong to her, one of the
officers threatened him that he would go straight to jail if he moved
again.  Further, the officers not only
told Poteet that they were present at his home to keep the peace but also
asserted that they were there Ato assist Tanya in getting her things.@  

Accordingly, in light of the
foregoing, we hold that Poteet provided sufficient evidence of police
interference with his possessory interest in the contents of his home to raise
a fact issue on whether the officers participated in the unconstitutional seizure
of his property.  See Marcus, 394
F.3d at 822-23.

c.      The officers=
entry was not merely an exercise of their Acommunity
caretaking@
function

 

Appellees also argue that the
officers did not violate the Fourth Amendment because, based on Poteet and Chin=s volatile breakup and quarrels over property, the officers were
legitimately exercising their Acommunity caretaking@ function when they entered Poteet=s home.  See Cady v.
Dombrowski, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973) (observing that police
frequently perform Acommunity
caretaking functions, totally divorced from the detection, investigation, or
acquisition of evidence relating to the violation of a criminal statute@).  








We disagree with appellees
that United States v. York, 895 F.2d 1026 (5th Cir. 1990), is analogous
to this case.  In York, the
circuit court stated that Aactivities or circumstances within a dwelling may lessen the owner=s reasonable expectation of privacy by creating a risk of intrusion
which is >reasonably
foreseeable.=@  Id. at 1029.  In that case, York had allowed a man and his
family to stay as guests in his home. 
When York came home drunk one night and threatened them, the man and his
sons left and called police to accompany them back into the house so that they
could remove their personal belongings. 
The court held that the police=s intrusion into York=s home that night became foreseeable Awhen York became intoxicated and belligerent and threatened [the man]
and his children, whom he had allowed to occupy his home.@  Id.  Therefore, the police=s limited entry into the house to keep the peace while the man removed
his family=s personal
possessions was reasonable and did not constitute a Fourth Amendment Asearch.@  Id. at 1030.








Here, in contrast, Chin
called police to conduct a civil standby not the same day she left Poteet=s home but three days after she, along with her parents and
brother-in-law, had already removed most of her personal belongings from the
home.  When Poteet had subsequently found
items that Chin had left behind, he had not kept them but rather had called Chin=s aunt and allowed the aunt to come to his home and collect the
items.  Furthermore, he was in the
process of negotiating with Chin=s attorney regarding the further exchange of property when the civil
standby occurred.  In light of Poteet=s return of property to Chin via her aunt, his ongoing communications
with Chin=s attorney
about exchanging property with her, and his statement to Chin=s attorney that he would make sure that any remaining property
belonging to Chin was returned to her, we cannot say that Poteet should have
foreseen that Officers Sullivan and Lucio would enter his home and allow not
just Chin but also an entire group of people with a U-Haul moving van to remove
most of the items in the home. 
Accordingly, we conclude that this was not the type of foreseeable incursion
that York exempts from the scope of the Fourth Amendment.

d.     The circumstances of the officers=
entry did not constitute a valid civil standby performed for a victim of
domestic violence

 

Finally, appellees argue that the officers= actions did not
violate the Fourth Amendment because article 5.045 of the Texas Code of
Criminal Procedure authorizes police to conduct civil standbys for victims of
family violence:

(a)
In the discretion of a peace officer, the officer may stay with a victim of
family violence to protect the victim and allow the victim to take the personal
property of the victim or of a child in the care of the victim to a place of
safety in an orderly manner.

 

(b) A
peace officer who provides assistance under Subsection (a) of this article is
not:

 

(1) civilly liable for an act or omission of the
officer that arises in connection with providing the assistance or determining
whether to provide the assistance; or

 

(2) civilly or criminally liable for the wrongful
appropriation of any personal property by the victim.

 








Tex. Code Crim. Proc.
Ann. art. 5.045. 
Because
article 5.045 does not require police officers to procure a warrant before
accompanying a domestic violence victim to retrieve his or her personal
property, appellees argue, the actions of Officers Sullivan and Lucio were not
unlawful.

First, we observe that no court has held that article 5.045
provides a blanket exception to the Fourth Amendment=s prohibition
against unreasonable searches and seizures. 
Nor does the plain language of the statute state as much.  Instead, the statute provides protection for
officers who assist domestic violence victims against civil liability stemming
from the officers= performance of that assistance.  Therefore, the statute seems to contemplate
situations in which an officer might violate the law while providing standby
assistance to a domestic violence victim but nevertheless would not be held
civilly liable for that violation.








But even if we assume that article 5.045 automatically
renders the officers= actions lawful, when we view the evidence
in the light most favorable to Poteet, we nevertheless conclude that a genuine
issue of fact arose with regard to whether the civil standby performed by
Officers Sullivan and Lucio was outside the scope of the statute.  The statute permits officers to stay with and
protect the victim so that the victim can Atake the personal
property of the victim . . . to a place of safety in an orderly manner.@[4]  Id. art. 5.045(a) (emphasis
added).  The statute does not authorize
the police to aid the victim in removing property from a residence.  See id.  Here, however, Poteet has produced evidence
that Officers Sullivan and Lucio prevented him from stopping Chin and her
companions from taking his property by confining him to a corner of his home,
physically restraining him by his shoulders, arms, and wrists, and threatening
him with going to jail.  Accordingly,
Poteet has raised a fact issue as to whether the officers= actions went
beyond mere protection into actually aiding Chin in removing property from the
home and, therefore, whether the officers= actions complied
with the statute.








Furthermore, when Chin and Officer Sullivan planned the
standby, she revealed to Officer Sullivan her plans to use a locksmith to break
into Poteet=s home and discussed with him the group of
friends and family that she was assembling to move items out of Poteet=s home.  The next day, Officers Sullivan and Lucio
arrived to execute the civil standby and saw a group of more than ten people
massed in front of Poteet=s house as well as a locksmith ready to
pick the lock of Poteet=s home. 
The situation then became Achaotic@ with the Chin=s group scattering
throughout the house and struggling over property.  We conclude that this evidence also raises a
question of fact regarding whether this civil standby exceeded the scope of the
assistance contemplated by the statute.  

Therefore, because an issue of material fact existed as to
whether the officers= conduct complied with article 5.045, the
record does not establish as a matter of law that Officers Sullivan and Lucio=s warrantless
entry into Poteet=s home was lawful.  

All in all, the issues of constitutional violations in this
case are extremely fact-intensive, and under Poteet=s version of the
events a fact finder could determine that Officers Sullivan and Lucio did more
than merely stand by to prevent violence but also unlawfully entered Poteet=s home and aided
Chin in seizing most of Poteet=s and his children=s personal
property.  We sustain Poteet=s first issue.[5]








2.     Were the constitutional rights violated by
Officers Sullivan and Lucio clearly established?

 








In his second and third
issues, Poteet argues that the police officers were not entitled to summary
judgment based on the affirmative defense of qualified immunity because there
were genuine issues of material fact underlying their assertions of
immunity.  Having found that Poteet
produced evidence establishing a violation of his Fourth Amendment right to be free from
unreasonable searches and seizures, we must
now consider whether the right was clearly established, that is, whether it
would be clear to a reasonable officer that his conduct was unlawful in the
situation he confronted.  Saucier,
533 U.S. at 202, 121 S. Ct. at 2156.  When various courts have determined that
certain factually similar conduct is a constitutional violation, the
constitutional right to be protected against such conduct is considered clearly
established even if courts have not agreed upon a precise formulation of the
violation.  Id. at 202-03, 121 S.
Ct. at 2157.  And while
objective reasonableness is a matter of law for the courts to decide, a denial
of summary judgment based on a material factual dispute is appropriate if there
are underlying historical facts in dispute that are material to the resolution
of the question of whether the defendants acted in an objectively reasonable
manner.  Mangieri v. Clifton, 29
F.3d 1012, 1015-16 (5th Cir. 1994).

        The parties have not
supplied us with, and we have not found, any case law specifically dealing with
domestic violence civil standbys under code of criminal procedure article
5.045.  However, the concept of the civil
standby is not a novel one.  Police often
provide assistance in civil matters to preserve the peace in situations such as
service of process, see Open Inns, Ltd. v. Chester County Sheriff=s Dept., 24 F.Supp.2d 410 (E.D. Pa.
1998), evictions, see Thomas v. Cohen, 304 F.3d 563 (6th Cir. 2002), cert.
denied, 538 U.S. 1032 (2003), and repossessions, see Soldal v. Cook
County, 506 U.S. 56, 113 S. Ct. 538 (1992). 
And as previously stated, the law is well settled that police officers
who perform civil standbys must act only to keep the peace, not to aid one
party over another or to effectuate the seizure of property.  See Marcus, 394 F.3d at 818.  Federal law recognizing that an unlawful
taking of property during a civil standby can amount to state action and a ' 1983 violation is clearly established.  Id. at 825.








In Marcus, the circuit
court reversed summary judgment for officers who were present while a creditor
repossessed a plaintiff=s car
because the evidence of the officer=s participation in the repossession raised fact issues regarding
whether reasonable officers would consider the participation violative of the
plaintiffs=
rights.  Id. at 824.  Even though the officers told plaintiffs that
they Acould not get involved@ in the repossession and that they were present Ato keep the peace and make sure no one would get hurt,@ one officer also poked a plaintiff several times in the chest with
sufficient force to knock the plaintiff backwards and threatened to take
plaintiffs immediately to jail if they did not let the repossessor take the
car, keep their mouths shut, and go back into the house.  Id. at 816-17.

Similarly, here, Poteet has
produced evidence raising a fact issue regarding whether Officers Sullivan and
Lucio did more in this civil standby than merely accompany Chin to keep the
peace while she removed her property. 
The officers told Poteet that they were at his home to keep the peace
and ordered him not to touch Chin or anyone in her group, and these comments
reflect their knowledge of a police officer=s proper role of preventing violence while conducting a civil
standby.  But Officers Sullivan and Lucio
also allegedly confined Poteet to a corner of his home, physically restrained
him, and threatened to take him to jail when he attempted to get away from the
officers and stop Chin from taking property that did not belong to her.  Furthermore, Poteet claims that the officers
also told him that they were there Ato assist Tanya in getting her things.@  








Crediting Poteet=s version of the events, as we must, we conclude that a reasonable
officer would know that this conduct amounted to an unlawful assistance of Chin
during the civil standby and a violation of Poteet=s constitutional rights. 
However, this evidence is disputed; the officers claimed that they never
physically restrained Poteet or prevented him from moving about the house and
that they were present only to make sure no physical violence occurred during
the standby.  Accordingly, the
differences in the parties= factual accounts must be resolved before a court can make the legal
determination of whether the officers acted in an objectively reasonable
manner.  See Mangieri, 29 F.3d at
1016. 
Therefore, we hold that, under the singular facts of this case, Officers
Sullivan and Lucio were not entitled to summary judgment on the grounds of
qualified immunity.  See Saucier,
533 U.S. at 201, 121 S. Ct. at 2156; Marcus, 394 F.3d at 824.  We sustain Poteet=s second and third issues with regard to Officers Sullivan and Lucio.

IV.  Captain
Byron Lake








Captain Lake also moved for
summary judgment on the grounds of qualified immunity, and the trial court
granted his motion.  To determine whether
summary judgment for Captain Lake was proper, we first consider whether Captain
Lake=s conduct violated Poteet=s constitutional rights.  See
Saucier, 533 U.S. at 201, 121 S. Ct. at 2156.  Captain Lake=s involvement in the civil standby consisted only of his discussion
with Chin regarding her request that police perform a civil standby and his
authorization of it.  According to Chin,
Captain Lake told her that the officers conducting the civil standby would
provide protection only and would not assist or get involved in any property
dispute.

Personal involvement is an essential element in a civil
rights cause of action alleging constitutional deprivation.  Thompkins v. Belt, 828
F.2d 298, 303 (5th Cir. 1987).  Under ' 1983, supervisors may be held liable if they affirmatively
participated in the acts giving rise to the constitutional deprivation
or if there is a causal connection between a supervisor=s wrongful conduct
and the constitutional violation.  Id.
at 304.  Therefore,
to survive summary judgment, Poteet must have produced evidence showing that
Captain Lake=s
involvement in the civil standbyCwhich consisted of his authorizing the standby and directing Officer
Sullivan to perform itCviolated
Poteet=s constitutional rights.








Poteet argues that police
should not have conducted the civil standby because Chin was not Aa victim of family violence.@  Tex. Code Crim. Proc. Ann. art. 5.045(a) (allowing police to
assist Aa victim of family violence@ in removing property belonging to the victim or a child in the victim=s care).  The definition of Afamily violence@ includes an
act by a member of a household against another member of the household, other
than an act in self-defense, that is intended to result in physical harm or a
threat that reasonably places the member in fear of imminent physical
harm.  Tex.
Fam. Code Ann. ' 71.004(1)
(Vernon 2002); Tex. Code Crim. Proc. Ann.
art. 5.02 (applying family code=s definition of Afamily
violence@ to article 5.045).[6]  

Chin told Captain Lake that
Poteet had engaged in physical contact and abusive behavior towards her in the
past and that he had grabbed her several times as she was packing her
belongings after their breakup.  Chin
also had expressed fear that Poteet would become violent towards her if she
went back to his home to get her personal property.  Furthermore, Poteet himself had told police
that Asomething big would happen@ if anyone came back and tried to get into his house.  Accordingly, there was evidence of at least
the existence of a threat of violenceCnot just from Chin=s allegations but also from Poteet=s own statements to policeCshould Chin return to remove items from Poteet=s home. Therefore, we conclude that Captain Lake did not violate
Poteet=s constitutional rights by determining either that Chin was a Avictim of family violence@ for purposes of performing a family violence civil standby or by
determining that a civil standby was warranted in this situation.  See Tex.
Fam. Code Ann. '' 71.004(1),
71.0021(a).  








Poteet also argues that
article 5.045 could not grant Chin a right to go upon Poteet=s property without his consent. 
According to Poteet, the Flower Mound Police Department knew that Chin
was not married to Poteet and had no ownership interest in the house and that
he had forbidden her to return. While we agree that nothing in article 5.045
permits unlawful entry or trespass, we also observe that article 5.045 does not
require the victim of family violence to have an ownership interest in the
place where the victim=s personal
property is located before the victim may return to gather the property.  Furthermore, there is no evidence that Captain
Lake was aware that Chin was planning to use a locksmith to break into Poteet=s home and allegedly trespass on his property.  In contrast to Officers Sullivan and Lucio,
Captain Lake did not observe the locksmith, moving van, and group of friends
and family assembled in front of Poteet=s house in anticipation of the civil standby, and he did not witness
the Achaotic@ scene that
ensued.  

Accordingly, we conclude that
Poteet did not satisfy his burden of showing that Captain Lake=s authorization of the civil standby violated his constitutional
rights.  We hold that summary judgment
for Captain Lake on the grounds of qualified immunity was proper and overrule
Poteet=s first three issues with regard to Captain Lake.

V.  Town
of Flower Mound








The Town of Flower Mound
moved for summary judgment on Poteet=s claims, arguing that Poteet=s constitutional rights were not violated or, alternatively, that his
constitutional rights were not violated as a result of any official policy,
custom, or practice of Flower Mound.  In
his fourth and fifth issues, Poteet argues that the trial court erred by
granting summary judgment to Flower Mound because Flower Mound had an official
policy or custom of violating persons= civil rights and because Captain Lake and Officers Sullivan and Lucio
violated Poteet=s civil
rights pursuant to this official policy or custom.

Section 1983 does not provide
for vicarious or respondeat superior liability. 
Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002), cert.
denied, 537 U.S. 1110 (2003). 
Municipalities face ' 1983 liability when the constitutional violation results
from the Aexecution of a government=s policy or custom, whether made by its lawmakers or by
those whose edicts or acts may fairly be said to represent official policy.@  Id.
(quoting Monell v. Dep=t of Social Servs.,
436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978)).  Proof
of municipal liability under ' 1983 requires (1) an official policy (or custom), of
which (2) a policy maker can be charged with actual or constructive knowledge,
and (3) a constitutional violation whose Amoving force@ is that policy (or custom).  Piotrowski v. City of Houston, 237
F.3d 567, 578 (5th Cir.), cert. denied, 534 U.S. 820 (2001).













Here, summary
judgment evidence of Flower Mound=s official policy with regard to civil standbys came in
the form of affidavit and deposition testimony from Flower Mound Police Chief
Kenneth G. Brooker.  Chief Brooker stated
that the Flower Mound Police Department does not have an official written
policy with regard to civil standbys, but in practice the police force adheres
to articles 5.04(a) and 5.045 of the code of criminal procedure when conducting
civil standbys.[7]  According to Chief Brooker, all Flower Mound
police officers are instructed on procedures and guidelines for conducting
civil standbys during field training. 
Flower Mound police officers are trained that the purpose of a civil
standby is not to conduct searches and seizures but rather to prevent violence,
ensure that no breach of the peace occurs, and provide protection to a victim
of family violence so that the victim can take his or her personal property to
a place of safety in an orderly manner. 
Further, the officers are instructed and trained that they are not to
get involved in any property disputes nor assist in the division, selection, or
removal of property during the civil standby. 

Poteet complains
that Flower Mound=s official policy precipitated the officers= violation of his civil rights because it allows a
warrantless entry into a person=s home, and property to be removed from the home, solely
on the basis of a verbal, unsworn representation to the police that the person
seeking the property owns it.  Poteet
bases this argument on deposition testimony from Chief Brooker, Captain Lake,
and Officer Sullivan that Flower Mound=s civil standby procedure does not require police to
independently verify that the person requesting a civil standby actually owns
the property that he or she wants to retrieve. 
Instead, as explained by Chief Brooker, police Atake the person or both parties= word for it. . . . 
We do not get involved in the property settlement issues.@  Further, police do
not confirm who owns the house where the property is located; according to
Chief Brooker, the police Ahave no interest in the property . . . .  It=s a civil issue between the two parties involved.@








In other words,
the summary judgment evidence showed that Flower Mound=s unwritten policy was to perform civil standbys solely to
keep the peaceCwithout participating in any unconstitutional searches or
seizures and without getting involved in issues of property ownershipCwhen requested to do so by a victim of family
violence.  Nothing in this policy gives
police carte blanche to violate the Fourth Amendment=s prohibition against unreasonable searches and seizures,
and nothing in this policy authorizes police to give any unlawful assistance or
aid to one party over another.  The mere
fact that Flower Mound does not verify the true owner of the real or personal
property before performing the standby does not make the policy violative of
citizens= constitutional rights because if police perform the
standby according to the guidelines, they will not commit any unlawful search,
seizure, or assistance.  

A defendant who
conclusively negates at least one essential element of a cause of action is
entitled to summary judgment on that claim. 
IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason, 143
S.W.3d 794, 798 (Tex. 2004).  Once the
defendant produces sufficient evidence to establish the right to summary
judgment, the burden shifts to the plaintiff to come forward with competent
controverting evidence raising a genuine issue of material fact with regard to
the element challenged by the defendant. 
Centeq Realty, Inc., 899 S.W.2d at 197.  We hold that Poteet did not establish that a
genuine issue of material fact existed as to whether Flower Mound=s official policy was the Amoving force@ behind any constitutional violation that Officers
Sullivan and Lucio may have committed during the civil standby.  See Piotrowski, 237 F.3d at 578.  Accordingly, the trial court did not err by
granting summary judgment to Flower Mound. 
See Centeq Realty, Inc., 899 S.W.2d at 197.  We overrule Poteet=s fourth and fifth issues.

 








VI. Conclusion

Having overruled Poteet=s issues pertaining to Captain Byron Lake and the Town of
Flower Mound, we affirm the trial court=s orders granting those parties= motions for summary judgment.  However, having sustained Poteet=s first three issues with regard to the remaining
appellees, we reverse the trial court=s summary judgment in favor of Officers Colin J. Sullivan
and Henry Lucio and remand the case to the trial court for further proceedings.


 

 

BOB MCCOY

JUSTICE

 

PANEL B:   LIVINGSTON, HOLMAN, and MCCOY, JJ.

 

DELIVERED: February 1, 2007











[1]Section 1983 provides,

Every person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State or Territory or the District of Columbia,
subjects, or causes to be subjected, any citizen of the United States or other
person within the jurisdiction thereof to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws, shall be liable
to the party injured in an action at law, suit in equity, or other proper
proceeding for redress.





[2]Subsequently, Poteet=s claims against all remaining
parties were either nonsuited or dismissed for want of prosecution.





[3]The Fourth Amendment requires that
the people=s right Ato
be secure in their persons, houses, papers, and effects, against unreasonable
searches and seizures, shall not be violated, and no Warrants shall issue, but
upon probable cause, supported by Oath or affirmation, and particularly
describing the place to be searched, and the persons or things to be seized.@ 
U.S. Const. amend. IV. 
The Fourteenth Amendment makes the Fourth Amendment applicable to the
States.  Mapp v. Ohio, 367 U.S.
643, 655, 81 S. Ct. 1684, 1691 (1961). 
The Fourteenth Amendment also provides that no state may Adeprive any person of life,
liberty, or property, without due process of law.@ 
U.S. Const. amend. XIV, ' 1. 





[4]We recognize that the language of
the statute, Athe officer may stay with
the victim,@ could be read to inject a temporal
requirementCthat is, the statute could be read
as authorizing the officer to remain at the scene at the time of a domestic
assault to assist the victim in retrieving his or her belongings, not to return
with the victim at a later time. 
However, the legislative history of the statue indicates that later
civil standbys, occurring after the victim has already vacated the premises,
were specifically within the contemplation of the legislature.  Op. Tex. Att=y Gen. No. JC-0112 (1999).  

Furthermore,
interpreting the statute to allow police to return with the victim furthers the
underlying policy of protecting victims and avoiding further violence;
otherwise, victims who make the decision to leave an abusive partner at a time
when violence is not then occurring would have to wait until yet another
abusive episode involving police response happens before being able to ask for
police assistance in removing their belongings. 





[5]Based on our holding that the
officers= conduct violated the Fourth
Amendment=s prohibition against unreasonable
searches and seizures, we need not address Poteet=s additional arguments that the
officers further violated the Fourth and Fourteenth Amendments by making a
seizure of his person and depriving him of his liberty and property without due
process of law.  See Tex. R. App. P. 47.1.





[6]Family
violence also includes Adating
violence,@
which means Aan
act by an individual that is against another individual with whom that person
has or has had a dating relationship and that is intended to result in physical
harm, bodily injury, assault, or sexual assault or that is a threat that
reasonably places the individual in fear of imminent physical harm, bodily
injury, assault, or sexual assault, but does not include defensive measures to
protect oneself.@  Tex.
Fam. Code Ann. ''
71.004(3), 71.0021(a).





[7]Article 5.04(a) provides, AThe primary duties of a peace
officer who investigates a family violence allegation or who responds to a
disturbance call that may involve family violence are to protect any potential
victim of family violence, enforce the law of this state, enforce a protective
order from another jurisdiction . . . , and make lawful arrests of violators.@ 
Tex. Code Crim. Proc. Ann.
art. 5.04(a) (Vernon 2005).

As previously
discussed, article 5.045 gives police discretion to Astay with a victim of family
violence to protect the victim and allow the victim to take the personal
property of the victim or of a child in the care of the victim to a place of
safety in an orderly manner.@  Id. art.
5.045(a).