**Phillip K. POTEET, Individually and as Next Friend for Jeffrey Poteet, a Minor, Appellant,**

v.

**Colin J. SULLIVAN, Henry Lucio, Byron Lake and Town of Flower Mound, Texas, Appellees.**

No. 2–05–338–CV.

Court of Appeals of Texas, Fort Worth.

Feb. 1, 2007.

Rehearing Overruled Feb. 2, 2007.

Verner & Brumley, P.C. and Jimmy L. Verner, Jr., Dallas, for Appellant.

Fanning, Harper & Martinson, Thomas P. Brandt, and John F. Roehm, III, Dallas, for Appellee.

PANEL B: LIVINGSTON, HOLMAN, and McCOY, JJ.

## OPINION ON REHEARING

BOB McCOY, Justice.

After considering our prior opinion on appellant's and appellees Colin J. Sullivan and Henry Lucio's motions for rehearing, we deny the motions, but withdraw our opinion and judgment dated November 30, 2006, and substitute the following.

### I. INTRODUCTION

Appellant Phillip K. Poteet appeals the trial court's grant of summary judgment in favor of the Town of Flower Mound and Flower Mound police officers Colin J. Sullivan, Henry Lucio, and Byron Lake. Because we hold that Poteet produced sufficient evidence raising a genuine question of material fact regarding whether Officers Sullivan and Lucio were entitled to the defense of qualified immunity, we reverse the trial court's grant of summary judg-

ment to Sullivan and Lucio. In all other respects, we affirm.

## II. BACKGROUND

This is the case of the bad breakup. Around January 2001, Poteet and his fiancee, Tanya Chin, moved from Oklahoma to Flower Mound, Texas, into a home that Poteet purchased. A year and a half later, on June 6, 2002, Poteet told Chin that he had accepted a job in Atlanta, Georgia, and that he wanted to break off their engagement. The events surrounding their division of property after their breakup form the basis of Poteet's lawsuit and appeal.

### A. Initial Calls to Police

The morning after the breakup, Chin called police to complain about a verbal argument between the two over property issues. According to the police report, Chin and Poteet eventually agreed to return each other's belongings, and Chin stated that she intended to pack up her personal items and move out. The report also observed that the officers saw no signs of physical violence.

Two days later, on Sunday, June 9, 2002, Chin's parents and brother-in-law came to Flower Mound to help her move. They loaded most of Chin's personal items into their vehicles, but Chin also attempted to take property belonging to Poteet as well. This time, Poteet called police. The police arrived and requested Chin and her family to leave; they did so, taking Chin's personal property with them. Later that afternoon, Poteet found some additional items belonging to Chin that she had left behind. Chin's aunt came to his home and collected the items. Poteet then changed the locks on the doors to his home and the security code to the home's alarm system.

The next morning, Chin returned to Poteet's home with her parents, her brother-in-law and his wife, her aunt, and a lock-

smith. As the locksmith began to pick the lock on the front door, Poteet called police to report that the group was attempting to break into his home. Officers arrived and requested the group to leave, and they complied. Later that day, Poteet again found items that Chin had left behind; he called Chin's aunt, who returned to the home and picked up the items. The next day, Poteet posted a "no trespassing" sign on his front door expressly stating that Chin did not live in the home and that he did not give her permission to enter the home.

Then on Wednesday, June 12, 2002, Poteet called police to file a report about Chin's behavior. The responding officer told Poteet that Chin could come on the premises and into the house because she had established residency there. According to the police report, the officer told Poteet that "this was all a civil matter." Poteet disagreed and "said if someone came back and tried to get into the house, he had a right to protect it and something big would happen."

Later that day, Poteet received a message on his home answering machine from Eric Hill, an attorney calling on Chin's behalf. Poteet returned the call the next day. Hill told Poteet that Chin wanted some items from the home, but Poteet claimed that those items belonged to him. Poteet told Hill that he would be willing to give Chin some of these items in exchange for Chin's engagement ring. Hill faxed Poteet a list of items that Chin wanted; Poteet faxed it back with notations showing items that he agreed to give Chin as well as items that he had already returned to Chin via her aunt. Poteet also informed Hill that he had allowed Chin to remove her personal property on June 9 and that none of Chin's property remained in the home; but if Poteet found any more property belonging to Chin, he would "exercise

reasonable care in ensuring that the items are returned to her."

## B. The Civil Standby

On Wednesday, the same day that Poteet called police to file a report, Chin also contacted police to request a "civil standby" so that she could remove her property from Poteet's home. She told Flower Mound Police Captain Byron Lake that Poteet had engaged in physical contact and abusive behavior towards her while they had dated, that Poteet had grabbed her several times as she was packing her belongings, and that she was afraid that Poteet would be violent towards her if she came back to his home to get her personal property. Captain Lake told Chin that police would conduct a thirty-minute civil standby and subsequently requested Officer Colin J. Sullivan to perform it. Officer Sullivan then contacted Chin, and they scheduled the standby to take place the next afternoon. Officer Sullivan arranged for Officer Henry Lucio to assist him with the civil standby.

The next day, Thursday, June 13, 2002, Officer Sullivan and Chin had several telephone conversations discussing the coordination of a locksmith, the people whom Chin needed to help her move her belongings, and whether Poteet would be present during the civil standby. At about 3:30 p.m., Officers Sullivan and Lucio arrived at Poteet's home to execute the civil standby; meeting them in the front yard were Chin and her parents, brother, and uncle, three of Poteet's neighbors, a locksmith, and other people whom Poteet did not recognize. Chin also had brought a U–Haul moving van, which was parked in the driveway. Poteet was inside his home along with his six-year-old son, nineteen-year-old daughter, and her two friends.

When the locksmith began to pick the lock on the front door, Poteet opened the door and saw Officers Sullivan and Lucio.

According to Poteet, the officers ordered him to keep the door open and pushed him away from the doorway. Poteet claimed that the officers told him they were there to keep the peace and "to assist Tanya in getting her things," and that if he touched Chin or anyone in her group, they would arrest him and take him to jail. Poteet had packed up many of his personal belongings in preparation for his move to Atlanta, and these boxes were sitting in the front entryway. Chin and her companions loaded up all these boxes into the moving van and then scattered throughout the rest of the house, gathering up his unboxed property and carrying it off.

Poteet claimed that, while Chin and her group were moving throughout his house and taking his personal property from the home, the police officers confined him to a corner of the home's entryway and physically restrained him by holding his shoulders, arms, and wrists. Poteet repeatedly tried to move out of the corner to stop Chin and her companions from carrying off his property, but each time he tried to move, the officers would shove him back into the corner. According to Poteet, when he tried to push back or resist the confinement, an officer put his finger in Poteet's face and said, "You move one more time, you touch me again, you're going straight to jail." Both officers, however, deny ever making any effort to stop Poteet or his family from moving about the house.

As the situation progressed, shouting and arguing ensued between Poteet and his family and Chin and her group, creating a situation that both Poteet and Officer Lucio described as "chaotic." Several struggles over property also broke out between the two sides. Poteet's daughter and Chin fought over a picture; when Poteet tried to go to his daughter, the officers continued blocking him in a corner

of the entryway and would not let him out. Poteet claimed that he finally slipped around the officers when he saw Chin's brother and father carrying out file boxes containing Poteet's tax documents, receipts, and other personal papers. Poteet grabbed the boxes and struggled with the men, hurting his back in the process. Meanwhile, the persons whom Poteet did not recognize, along with Chin's father and uncle, began to move Poteet's refrigerator out the front door. Poteet and his daughter pushed on the opposite side of the refrigerator, resisting their efforts to remove the refrigerator from his home. In addition, Poteet and Chin's father fought over a picture and broke the glass, which sprayed into the foyer of Poteet's home.

Finally, Officer Sullivan told Chin and her companions that they were out of time and needed to leave the house. According to Poteet, after Chin left, Officer Lucio searched through his house by "perform[ing] a sweep of the premises"; Officer Lucio denies this. Poteet claims that Chin took most of his property that had been in the house, including items such as his kitchen and dining room tables and chairs, the comforter and pillows from his daughter's bedroom, and his son's board games and Nintendo 64 video game system.

## C. Procedural History

Poteet, on behalf of himself and his son, Jeffrey, sued Chin, Chin's friends and relatives who participated in the removal of items from his home, Officers Sullivan and Lucio, Captain Lake, and the Town of Flower Mound for damages stemming from the incident. In this lawsuit, Poteet asserted a § 1983 claim against appellees, arguing that they were liable to him because they deprived him of his Fourth and Fifth Amendment rights to be free from unreasonable searches and seizures and from being deprived of his property without due process of law. U.S. Const. amend. IV, V; 42 U.S.C.A. § 1983 (West 2003).[1] Officers Sullivan and Lucio, Captain Lake, and the Town of Flower Mound all filed motions for summary judgment, which the trial court granted.[2] Poteet now appeals.

## III. Officers Sullivan and Lucio

Officers Sullivan and Lucio moved for summary judgment on the grounds of qualified immunity, and the trial court granted their motions. In his first three issues, Poteet argues that the trial court erred in granting summary judgment, contending that the officers are not entitled to qualified immunity because they violated his constitutional rights by entering his house without a warrant and confining him to a portion of his home while allowing Chin and her entourage to take his personal property from the home.

### A. Standard of Review

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant,*

---

**1.** Section 1983 provides,

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**2.** Subsequently, Poteet's claims against all remaining parties were either nonsuited or dismissed for want of prosecution.

73 S.W.3d 211, 215 (Tex.2002); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965).

■ Generally, a defendant is entitled to summary judgment on an affirmative defense if the defendant presents evidence that establishes each element of the affirmative defense as a matter of law. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex.1996). For the defense of qualified immunity under federal law and section 1983 claims, however, such is not the case: "[A] defendant asserting immunity is not required to establish the defense beyond peradventure, as he would have to do for other affirmative defenses." *Cousin v. Small*, 325 F.3d 627, 632 (5th Cir.), *cert. denied*, 540 U.S. 826, 124 S.Ct. 181, 157 L.Ed.2d 48 (2003). The moving party is not required to put forth evidence to meet its summary judgment burden for a claim of qualified immunity; rather, it is sufficient that the movant in good faith pleads that it is entitled to immunity. *Id.* Once the movant asserts this affirmative defense, the burden shifts to the plaintiff to rebut it. *Id.* Accordingly, to survive summary judgment, Poteet was required to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the issue of

whether the officers were entitled to qualified immunity. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995).

## B. Qualified Immunity

■ Government officials performing discretionary functions are protected from civil liability under the doctrine of qualified immunity if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). To review claims of qualified immunity, a court first asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officers' conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If so, the court must then consider whether the right was clearly established, that is, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* at 202, 121 S.Ct. at 2156.

### 1. Did Officers Sullivan and Lucio violate Poteet's constitutional rights?

In his first issue, Poteet argues that all appellees were not entitled to judgment as a matter of law that they had not violated his civil rights because the evidence showed that appellees violated the Fourth and Fourteenth Amendments when Officers Sullivan and Lucio accompanied Chin into his home, obstructed him from preventing the seizure of most of his possessions, and supervised and assisted with this intrusion and seizure. *See* U.S. CONST. amend. IV, XIV.[3]

---

**3.** The Fourth Amendment requires that the people's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violat-

ed, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be

a. *The officers' entry constituted a "search" under the Fourth Amendment*

Appellees argue that no Fourth Amendment violation occurred because the officers entered Poteet's home just to keep the peace while Chin removed her property, not to search through it for the purpose of finding something. However, "[a] search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). Therefore, "'the issue is not' the law enforcement officer's 'state of mind'—whether he was intentionally rummaging about for contraband or wished to find something in particular—'but the objective effect of his actions'—whether a reasonable expectation of privacy was infringed." *United States v. Maple,* 348 F.3d 260, 263 (D.C.Cir.2003) (op. on reh'g) (quoting *Bond v. United States,* 529 U.S. 334, 338 n. 2, 120 S.Ct. 1462, 1465 n. 2, 146 L.Ed.2d 365 (2000)). Accordingly, we do not agree with appellees that a person's right to be secure in his home would not be infringed when police enter the home and block the homeowner in a corner while allowing other people to carry away the homeowner's property merely because the police did not enter for the purpose of looking through the home for some item. Rather, viewing the record in the light most favorable to Poteet, we conclude that the officers' actions did violate Poteet's reasonable expectation of privacy and, thus, constituted a "search" for purposes of the Fourth Amendment.

b. *The officers' entry may have constituted a "seizure" under the Fourth Amendment*

Appellees also argue that Poteet did not come forward with any evidence that Officer Sullivan or Lucio seized and removed his property or that they supervised and assisted with the seizure of his property. A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property. *Jacobsen,* 466 U.S. at 133, 104 S.Ct. at 1656. The question here, then, is whether the assistance provided by Officers Sullivan and Lucio to Chin and her group during the civil standby rose to the level of constituting an interference with Poteet's possessory interests in the property that Chin removed from his home.

It is well settled that police officers who perform civil standbys to keep the peace during a private party's repossession of property when right to possession of that property is disputed are not state actors if they act only to keep the peace, "but they cross the line if they affirmatively intervene to aid the repossessor." *Marcus v. McCollum,* 394 F.3d 813, 818 (10th Cir.2004) (citing *Barrett v. Harwood,* 189 F.3d 297, 302 (2d Cir.1999), *cert. denied,* 530 U.S. 1262, 120 S.Ct. 2719, 147 L.Ed.2d 984 (2000)); *Abbott v. Latshaw,* 164 F.3d 141, 149 (3d Cir.1998), *cert. denied,* 527 U.S. 1035, 119 S.Ct. 2393, 144 L.Ed.2d 794 (1999); *Cofield v. Randolph County Comm'n,* 90 F.3d 468, 471 (11th Cir.1996); *Jones v. Gutschenritter,* 909 F.2d 1208, 1211–12 (8th Cir.1990); *Greco v. Guss,* 775 F.2d 161, 168 (7th Cir.1985); *Harris v. City of Roseburg,* 664 F.2d 1121, 1127 (9th Cir.1981); *United States v. Coleman,* 628 F.2d 961, 964 & n. 1 (6th Cir.

seized." U.S. Const. amend. IV. The Fourteenth Amendment makes the Fourth Amendment applicable to the States. *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961). The Fourteenth Amendment also provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

1980); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 513 (5th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980). "[T]he overarching lesson of the case law is that officers may act to diffuse a volatile situation, but may not aid the repossessor in such a way that the repossession would not have occurred but for their assistance." *Marcus*, 394 F.3d at 819. In other words, although mere acquiescence by the police to "stand by in case of trouble" is insufficient to constitute state action, police intervention and aid will constitute state action. *Harris*, 664 F.2d at 1127.

Our analysis is not affected by the fact that the foregoing cases do not specifically deal with the domestic violence context because the role of police in all civil standbys—whether in the domestic violence or any other context—is to prevent violence from occurring. *See* TEX.CODE CRIM. PROC. ANN. art. 5.045 (Vernon 2005) (providing that a peace officer "may stay with a victim of family violence to protect the victim and allow the victim to take the personal property of the victim or of a child in the care of the victim to a place of safety in an orderly manner"); *Marcus*, 394 F.3d at 818. Like a repossessor, Chin went onto property owned by another to retrieve items, and the ownership of those items was disputed. Nothing in the law gives police a greater right to provide affirmative aid to a domestic violence victim who goes onto another's property and removes items to which ownership is disputed merely because the dispute occurs during a domestic violence standby, as opposed to any other type of standby. The peacekeeping role of the police is the same no matter the subject matter of the standby.

Viewing the evidence in the light most favorable to Poteet, we conclude that the evidence raises a fact issue as to whether the actions of Officers Sullivan and Lucio went beyond keeping the peace into providing affirmative aid to the seizure of most of the contents of Poteet's home. Without the officers' assistance, Chin may not have been able to gain entrance into Poteet's home; Poteet had made clear that Chin was not allowed on his property, but the officers ordered him to keep the door open to Chin and her group and pushed him away from the door so that they could enter. Furthermore, Poteet claimed that, at least for the first part of the standby, the officers' physical restraint and threats of jail precluded him from even attempting to stop Chin and her companions from carrying off his property because they confined him to a corner of his home and held his shoulders, arms, and wrists while Chin and her companions took property from the home. When Poteet attempted to get away from the officers and stop Chin from taking items that did not belong to her, one of the officers threatened him that he would go straight to jail if he moved again. Further, the officers not only told Poteet that they were present at his home to keep the peace but also asserted that they were there "to assist Tanya in getting her things."

Accordingly, in light of the foregoing, we hold that Poteet provided sufficient evidence of police interference with his possessory interest in the contents of his home to raise a fact issue on whether the officers participated in the unconstitutional seizure of his property. *See Marcus*, 394 F.3d at 822–23.

c. *The officers' entry was not merely an exercise of their "community caretaking" function*

Appellees also argue that the officers did not violate the Fourth Amendment because, based on Poteet and Chin's volatile breakup and quarrels over property, the officers were legitimately exercising their "community caretaking" function

when they entered Poteet's home. *See Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973) (observing that police frequently perform "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute").

We disagree with appellees that *United States v. York*, 895 F.2d 1026 (5th Cir. 1990), is analogous to this case. In *York*, the circuit court stated that "activities or circumstances within a dwelling may lessen the owner's reasonable expectation of privacy by creating a risk of intrusion which is 'reasonably foreseeable.'" *Id.* at 1029. In that case, York had allowed a man and his family to stay as guests in his home. When York came home drunk one night and threatened them, the man and his sons left and called police to accompany them back into the house so that they could remove their personal belongings. The court held that the police's intrusion into York's home that night became foreseeable "when York became intoxicated and belligerent and threatened [the man] and his children, whom he had allowed to occupy his home." *Id.* Therefore, the police's limited entry into the house to keep the peace while the man removed his family's personal possessions was reasonable and did not constitute a Fourth Amendment "search." *Id.* at 1030.

Here, in contrast, Chin called police to conduct a civil standby not the same day she left Poteet's home but three days after she, along with her parents and brother-in-law, had already removed most of her personal belongings from the home. When Poteet had subsequently found items that Chin had left behind, he had not kept them but rather had called Chin's aunt and allowed the aunt to come to his home and collect the items. Furthermore, he was in the process of negotiating with Chin's at-

torney regarding the further exchange of property when the civil standby occurred. In light of Poteet's return of property to Chin via her aunt, his ongoing communications with Chin's attorney about exchanging property with her, and his statement to Chin's attorney that he would make sure that any remaining property belonging to Chin was returned to her, we cannot say that Poteet should have foreseen that Officers Sullivan and Lucio would enter his home and allow not just Chin but also an entire group of people with a U–Haul moving van to remove most of the items in the home. Accordingly, we conclude that this was not the type of foreseeable incursion that *York* exempts from the scope of the Fourth Amendment.

d. *The circumstances of the officers' entry did not constitute a valid civil standby performed for a victim of domestic violence*

■ Finally, appellees argue that the officers' actions did not violate the Fourth Amendment because article 5.045 of the Texas Code of Criminal Procedure authorizes police to conduct civil standbys for victims of family violence:

(a) In the discretion of a peace officer, the officer may stay with a victim of family violence to protect the victim and allow the victim to take the personal property of the victim or of a child in the care of the victim to a place of safety in an orderly manner.

(b) A peace officer who provides assistance under Subsection (a) of this article is not:

(1) civilly liable for an act or omission of the officer that arises in connection with providing the assistance or determining whether to provide the assistance; or

(2) civilly or criminally liable for the wrongful appropriation of any personal property by the victim.

TEX.CODE CRIM. PROC. ANN. art. 5.045. Because article 5.045 does not require police officers to procure a warrant before accompanying a domestic violence victim to retrieve his or her personal property, appellees argue, the actions of Officers Sullivan and Lucio were not unlawful.

First, we observe that no court has held that article 5.045 provides a blanket exception to the Fourth Amendment's prohibition against unreasonable searches and seizures. Nor does the plain language of the statute state as much. Instead, the statute provides protection for officers who assist domestic violence victims against civil liability stemming from the officers' performance of that assistance. Therefore, the statute seems to contemplate situations in which an officer might violate the law while providing standby assistance to a domestic violence victim but nevertheless would not be held civilly liable for that violation.

But even if we assume that article 5.045 automatically renders the officers' actions lawful, when we view the evidence in the light most favorable to Poteet, we nevertheless conclude that a genuine issue of fact arose with regard to whether the civil standby performed by Officers Sullivan and Lucio was outside the scope of the statute. The statute permits officers to stay with and protect the victim so that *the victim* can "take the personal property of the victim . . . to a place of safety in an *orderly manner.*"[4]  *Id.* art. 5.045(a) (emphasis added). The statute does not authorize the police to aid the victim in removing property from a residence. *See id.* Here, however, Poteet has produced evidence that Officers Sullivan and Lucio prevented him from stopping Chin and her companions from taking his property by confining him to a corner of his home, physically restraining him by his shoulders, arms, and wrists, and threatening him with going to jail. Accordingly, Poteet has raised a fact issue as to whether the officers' actions went beyond mere protection into actually aiding Chin in removing property from the home and, therefore, whether the officers' actions complied with the statute.

Furthermore, when Chin and Officer Sullivan planned the standby, she revealed to Officer Sullivan her plans to use a locksmith to break into Poteet's home and discussed with him the group of friends and family that she was assembling to move items out of Poteet's home. The next day, Officers Sullivan and Lucio arrived to execute the civil standby and saw a group of more than ten people massed in front of Poteet's house as well as a locksmith ready to pick the lock of Poteet's

---

4. We recognize that the language of the statute, "the officer may *stay* with the victim," could be read to inject a temporal requirement—that is, the statute could be read as authorizing the officer to remain at the scene at the time of a domestic assault to assist the victim in retrieving his or her belongings, not to return with the victim at a later time. However, the legislative history of the statute indicates that later civil standbys, occurring after the victim has already vacated the premises, were specifically within the contemplation of the legislature. Op. Tex. Att'y Gen. No. JC–0112 (1999).

Furthermore, interpreting the statute to allow police to return with the victim furthers the underlying policy of protecting victims and avoiding further violence; otherwise, victims who make the decision to leave an abusive partner at a time when violence is not then occurring would have to wait until yet another abusive episode involving police response happens before being able to ask for police assistance in removing their belongings.

home. The situation then became "chaotic" with the Chin's group scattering throughout the house and struggling over property. We conclude that this evidence also raises a question of fact regarding whether this civil standby exceeded the scope of the assistance contemplated by the statute.

Therefore, because an issue of material fact existed as to whether the officers' conduct complied with article 5.045, the record does not establish as a matter of law that Officers Sullivan and Lucio's warrantless entry into Poteet's home was lawful.

All in all, the issues of constitutional violations in this case are extremely fact-intensive, and under Poteet's version of the events a fact finder could determine that Officers Sullivan and Lucio did more than merely stand by to prevent violence but also unlawfully entered Poteet's home and aided Chin in seizing most of Poteet's and his children's personal property. We sustain Poteet's first issue.[5]

## 2. Were the constitutional rights violated by Officers Sullivan and Lucio clearly established?

■■■■ In his second and third issues, Poteet argues that the police officers were not entitled to summary judgment based on the affirmative defense of qualified immunity because there were genuine issues of material fact underlying their assertions of immunity. Having found that Poteet produced evidence establishing a violation of his Fourth Amendment right to be free from unreasonable searches and seizures, we must now consider whether the right was clearly established, that is, whether it

would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156. When various courts have determined that certain factually similar conduct is a constitutional violation, the constitutional right to be protected against such conduct is considered clearly established even if courts have not agreed upon a precise formulation of the violation. *Id.* at 202–03, 121 S.Ct. at 2157. And while objective reasonableness is a matter of law for the courts to decide, a denial of summary judgment based on a material factual dispute is appropriate if there are underlying historical facts in dispute that are material to the resolution of the question of whether the defendants acted in an objectively reasonable manner. *Mangieri v. Clifton,* 29 F.3d 1012, 1015–16 (5th Cir. 1994).

■■■■ The parties have not supplied us with, and we have not found, any case law specifically dealing with domestic violence civil standbys under code of criminal procedure article 5.045. However, the concept of the civil standby is not a novel one. Police often provide assistance in civil matters to preserve the peace in situations such as service of process, *see Open Inns, Ltd. v. Chester County Sheriff's Dept.,* 24 F.Supp.2d 410 (E.D.Pa.1998), evictions, *see Thomas v. Cohen,* 304 F.3d 563 (6th Cir. 2002), *cert. denied,* 538 U.S. 1032, 123 S.Ct. 2075, 155 L.Ed.2d 1061 (2003), and repossessions, *see Soldal v. Cook County,* 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). And as previously stated, the law is well settled that police officers who perform civil standbys must act only to keep the peace, not to aid one party over anoth-

---

**5.** Based on our holding that the officers' conduct violated the Fourth Amendment's prohibition against unreasonable searches and seizures, we need not address Poteet's additional arguments that the officers further violated

the Fourth and Fourteenth Amendments by making a seizure of his person and depriving him of his liberty and property without due process of law. *See* TEX.R.APP. P. 47.1.

er or to effectuate the seizure of property. *See Marcus,* 394 F.3d at 818. Federal law recognizing that an unlawful taking of property during a civil standby can amount to state action and a § 1983 violation is clearly established. *Id.* at 825.

In *Marcus,* the circuit court reversed summary judgment for officers who were present while a creditor repossessed a plaintiff's car because the evidence of the officer's participation in the repossession raised fact issues regarding whether reasonable officers would consider the participation violative of the plaintiffs' rights. *Id.* at 824. Even though the officers told plaintiffs that they "could not get involved" in the repossession and that they were present "to keep the peace and make sure no one would get hurt," one officer also poked a plaintiff several times in the chest with sufficient force to knock the plaintiff backwards and threatened to take plaintiffs immediately to jail if they did not let the repossessor take the car, keep their mouths shut, and go back into the house. *Id.* at 816–17.

Similarly, here, Poteet has produced evidence raising a fact issue regarding whether Officers Sullivan and Lucio did more in this civil standby than merely accompany Chin to keep the peace while she removed her property. The officers told Poteet that they were at his home to keep the peace and ordered him not to touch Chin or anyone in her group, and these comments reflect their knowledge of a police officer's proper role of preventing violence while conducting a civil standby. But Officers Sullivan and Lucio also allegedly confined Poteet to a corner of his home, physically restrained him, and threatened to take him to jail when he attempted to get away from the officers and stop Chin from taking property that did not belong to her. Furthermore, Poteet claims that the officers also told him that they were there "to assist Tanya in getting her things."

Crediting Poteet's version of the events, as we must, we conclude that a reasonable officer would know that this conduct amounted to an unlawful assistance of Chin during the civil standby and a violation of Poteet's constitutional rights. However, this evidence is disputed; the officers claimed that they never physically restrained Poteet or prevented him from moving about the house and that they were present only to make sure no physical violence occurred during the standby. Accordingly, the differences in the parties' factual accounts must be resolved before a court can make the legal determination of whether the officers acted in an objectively reasonable manner. *See Mangieri,* 29 F.3d at 1016. Therefore, we hold that, under the singular facts of this case, Officers Sullivan and Lucio were not entitled to summary judgment on the grounds of qualified immunity. *See Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156; *Marcus,* 394 F.3d at 824. We sustain Poteet's second and third issues with regard to Officers Sullivan and Lucio.

### IV. CAPTAIN BYRON LAKE

■ Captain Lake also moved for summary judgment on the grounds of qualified immunity, and the trial court granted his motion. To determine whether summary judgment for Captain Lake was proper, we first consider whether Captain Lake's conduct violated Poteet's constitutional rights. *See Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156. Captain Lake's involvement in the civil standby consisted only of his discussion with Chin regarding her request that police perform a civil standby and his authorization of it. According to Chin, Captain Lake told her that the officers conducting the civil standby would provide

protection only and would not assist or get involved in any property dispute.

■■■■ Personal involvement is an essential element in a civil rights cause of action alleging constitutional deprivation. *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir.1987). Under § 1983, supervisors may be held liable if they affirmatively participated in the acts giving rise to the constitutional deprivation or if there is a causal connection between a supervisor's wrongful conduct and the constitutional violation. *Id.* at 304. Therefore, to survive summary judgment, Poteet must have produced evidence showing that Captain Lake's involvement in the civil standby—which consisted of his authorizing the standby and directing Officer Sullivan to perform it—violated Poteet's constitutional rights.

Poteet argues that police should not have conducted the civil standby because Chin was not "a victim of family violence." TEX.CODE CRIM. PROC. ANN. art. 5.045(a) (allowing police to assist "a victim of family violence" in removing property belonging to the victim or a child in the victim's care). The definition of "family violence" includes an act by a member of a household against another member of the household, other than an act in self-defense, that is intended to result in physical harm or a threat that reasonably places the member in fear of imminent physical harm. TEX. FAM.CODE ANN. § 71.004(1) (Vernon 2002); TEX.CODE CRIM. PROC. ANN. art. 5.02 (applying family code's definition of "family violence" to article 5.045).[6]

Chin told Captain Lake that Poteet had engaged in physical contact and abusive behavior towards her in the past and that he had grabbed her several times as she was packing her belongings after their breakup. Chin also had expressed fear that Poteet would become violent towards her if she went back to his home to get her personal property. Furthermore, Poteet himself had told police that "something big would happen" if anyone came back and tried to get into his house. Accordingly, there was evidence of at least the existence of a threat of violence—not just from Chin's allegations but also from Poteet's own statements to police—should Chin return to remove items from Poteet's home. Therefore, we conclude that Captain Lake did not violate Poteet's constitutional rights by determining either that Chin was a "victim of family violence" for purposes of performing a family violence civil standby or by determining that a civil standby was warranted in this situation. *See* TEX. FAM.CODE ANN. §§ 71.004(1), 71.0021(a).

Poteet also argues that article 5.045 could not grant Chin a right to go upon Poteet's property without his consent. According to Poteet, the Flower Mound Police Department knew that Chin was not married to Poteet and had no ownership interest in the house and that he had forbidden her to return. While we agree that nothing in article 5.045 permits unlawful entry or trespass, we also observe that article 5.045 does not require the victim of family violence to have an ownership interest in the place where the victim's personal property is located before the victim may return to gather the property. Furthermore, there is no evidence that Captain Lake was aware that Chin was planning to use a locksmith to break into Poteet's home and allegedly trespass on his proper-

---

**6.** Family violence also includes "dating violence," which means "an act by an individual that is against another individual with whom that person has or has had a dating relationship and that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the individual in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself." TEX. FAM.CODE ANN. §§ 71.004(3), 71.0021(a).

ty. In contrast to Officers Sullivan and Lucio, Captain Lake did not observe the locksmith, moving van, and group of friends and family assembled in front of Poteet's house in anticipation of the civil standby, and he did not witness the "chaotic" scene that ensued.

Accordingly, we conclude that Poteet did not satisfy his burden of showing that Captain Lake's authorization of the civil standby violated his constitutional rights. We hold that summary judgment for Captain Lake on the grounds of qualified immunity was proper and overrule Poteet's first three issues with regard to Captain Lake.

## V. TOWN OF FLOWER MOUND

■ The Town of Flower Mound moved for summary judgment on·Poteet's claims, arguing that Poteet's constitutional rights were not violated or, alternatively, that his constitutional rights were not violated as a result of any official policy, custom, or practice of Flower Mound. In his fourth and fifth issues, Poteet argues that the trial court erred by granting summary judgment to Flower Mound because Flower Mound had an official policy or custom of violating persons' civil rights and because Captain Lake and Officers Sullivan and Lucio violated Poteet's civil rights pursuant to this official policy or custom.

Section 1983 does not provide for vicarious or respondeat superior liability. *Pineda v. City of Houston*, 291 F.3d 325, 328

(5th Cir.2002), *cert. denied*, 537 U.S. 1110, 123 S.Ct. 892, 154 L.Ed.2d 782 (2003). Municipalities face § 1983 liability when the constitutional violation results from the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978)). Proof of municipal liability under § 1983 requires (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy (or custom). *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.), *cert. denied*, 534 U.S. 820, 122 S.Ct. 53, 151 L.Ed.2d 23 (2001).

Here, summary judgment evidence of Flower Mound's official policy with regard to civil standbys came in the form of affidavit and deposition testimony from Flower Mound Police Chief Kenneth G. Brooker. Chief Brooker stated that the Flower Mound Police Department does not have an official written policy with regard to civil standbys, but in practice the police force adheres to articles 5.04(a) and 5.045 of the code of criminal procedure when conducting civil standbys.[7] According to Chief Brooker, all Flower Mound police officers are instructed on procedures and guidelines for conducting civil standbys during field training. Flower Mound police officers are trained that the purpose of

---

**7.** Article 5.04(a) provides, "The primary duties of a peace officer who investigates a family violence allegation or who responds to a disturbance call that may involve family violence are to protect any potential victim of family violence, enforce the law of this state, enforce a protective order from another jurisdiction ..., and make lawful arrests of violators." TEX.CODE CRIM. PROC. ANN. art. 5.04(a) (Vernon 2005).

As previously discussed, article 5.045 gives police discretion to "stay with a victim of family violence to protect the victim and allow the victim to take the personal property of the victim or of a child in the care of the victim to a place of safety in an orderly manner." *Id.* art. 5.045(a).

a civil standby is not to conduct searches and seizures but rather to prevent violence, ensure that no breach of the peace occurs, and provide protection to a victim of family violence so that the victim can take his or her personal property to a place of safety in an orderly manner. Further, the officers are instructed and trained that they are not to get involved in any property disputes nor assist in the division, selection, or removal of property during the civil standby.

Poteet complains that Flower Mound's official policy precipitated the officers' violation of his civil rights because it allows a warrantless entry into a person's home, and property to be removed from the home, solely on the basis of a verbal, unsworn representation to the police that the person seeking the property owns it. Poteet bases this argument on deposition testimony from Chief Brooker, Captain Lake, and Officer Sullivan that Flower Mound's civil standby procedure does not require police to independently verify that the person requesting a civil standby actually owns the property that he or she wants to retrieve. Instead, as explained by Chief Brooker, police "take the person or both parties' word for it.... We do not get involved in the property settlement issues." Further, police do not confirm who owns the house where the property is located; according to Chief Brooker, the police "have no interest in the property.... It's a civil issue between the two parties involved."

In other words, the summary judgment evidence showed that Flower Mound's unwritten policy was to perform civil standbys solely to keep the peace—without participating in any unconstitutional searches or seizures and without getting involved in issues of property ownership—when requested to do so by a victim of family violence. Nothing in this policy gives police carte blanche to violate the Fourth Amendment's prohibition against unreasonable searches and seizures, and nothing in this policy authorizes police to give any unlawful assistance or aid to one party over another. The mere fact that Flower Mound does not verify the true owner of the real or personal property before performing the standby does not make the policy violative of citizens' constitutional rights because if police perform the standby according to the guidelines, they will not commit any unlawful search, seizure, or assistance.

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. *Centeq Realty, Inc.,* 899 S.W.2d at 197. We hold that Poteet did not establish that a genuine issue of material fact existed as to whether Flower Mound's official policy was the "moving force" behind any constitutional violation that Officers Sullivan and Lucio may have committed during the civil standby. *See Piotrowski,* 237 F.3d at 578. Accordingly, the trial court did not err by granting summary judgment to Flower Mound. *See Centeq Realty, Inc.,* 899 S.W.2d at 197. We overrule Poteet's fourth and fifth issues.

## VI. CONCLUSION

Having overruled Poteet's issues pertaining to Captain Byron Lake and the Town of Flower Mound, we affirm the trial court's orders granting those parties' mo-

tions for summary judgment. However, having sustained Poteet's first three issues with regard to the remaining appellees, we reverse the trial court's summary judgment in favor of Officers Colin J. Sullivan and Henry Lucio and remand the case to the trial court for further proceedings.